**FOX RIVER PAPER CORPORATION v. UNITED STATES.**

No. 9267.

Circuit Court of Appeals, Seventh Circuit.

Jan. 23, 1948.

Leo J. Federer and Edmund B. Shea, both of Milwaukee, Wis., for appellant.

Timothy T. Cronin, U. S. Atty., and E. J. Koelzer, Asst. U. S. Atty., both of Milwaukee, Wis., Theron L. Caudle, Asst. Atty. Gen., and Helen Goodner, Helen R. Carloss, Robert N. Anderson, and Fred E. Youngman, Sp. Assts. to Atty. Gen., for appellee.

Before SPARKS, KERNER, and MINTON, Circuit Judges.

MINTON, Circuit Judge.

In 1938 the plaintiff-appellant, Fox River Paper Corporation, hereafter referred to as the taxpayer, purchased a paper mill from the Fox River Paper Company, hereafter referred to as the old company, for $1,250,000 in cash and all of the taxpayer's authorized preferred stock, consisting of 5,000 shares of a par value of $100 each. In its Federal income tax returns for 1939 and 1940 the taxpayer claimed depreciation on a valuation of $1,750,000 on the paper mill buildings, machinery, equipment, and other fixed assets acquired from the old company.[1] In auditing the taxpayer's returns, the Commissioner concluded that the preferred stock given as part of the purchase price was worth only $250,000 at the time the property was acquired instead of $500,000 as claimed by the taxpayer, reduced the depreciation thus claimed, and increased the tax accordingly. The taxpayer paid the tax and brought this action to recover. The District Court sustained the Commissioner's valuation and denied recovery, hence this appeal.

The District Court found that the value of the fixed assets acquired from the old company was not $1,750,000 but $1,500,000, and that the stock was worth only $50 per share. We have to determine only whether the finding of the trial court is clearly erroneous.[2] The finding is not clearly erroneous if there is substantial evidence to support it. We consider only the evidence that supports the court's finding. We do not weigh the evidence or resolve any conflicts therein, or consider here the credibility of the witnesses.

Valuation is a question of fact. In valuing the stock, the value of the underlying assets is only one of the factors for the court to consider. The taxpayer places all its reliance upon the value of the underlying assets and derives this value by the acceptance of the opinion evidence of two engineers whose valuations are based upon reproduction cost new less depreciation and are substantially above the $1,750,000 contended for by the taxpayer, and the opinion of the taxpayer's president, an experienced paper manufacturer, that the value of the underlying assets was $2,900,000. That was the value of the fixed assets which he had represented to the Reconstruction Finance Corporation.

Such opinion evidence as to the value of the underlying assets is material in determining the value of the preferred stock in question, but it is far from conclusive. Indeed, a failure to follow such opinion evidence alone is not an error of law. In a case involving utility valuation, the Supreme Court said in Dayton P. & L. Co. v. Public Utilities Comm., 292 U.S. 290, 299, 300, 54 S.Ct. 647, 652, 78 L.Ed. 1267:

"Variations so wide are sufficient of themselves to disprove the existence of a market in the strict or proper sense. Sinclair Refining Co. v. Jenkins Petroleum Process Co., 289 U.S. 689, 697, 698, 699, 53 S.Ct. 736, [77 L.Ed. 1449,] 88 A.L.R. 496. If they have any probative effect, it is that of expressions of opinion by men familiar with the gas business and its op-

---

[1] 26 U.S.C.A. Int.Rev.Code, § 23.

[2] Federal Rules of Civil Procedure, rule 52(a), 28 U.S.C.A. following section 723c.

portunities for profit. But plainly opinions thus offered, even if entitled to some weight, have no such conclusive force that there is error of law in refusing to follow them. This is true of opinion evidence generally, whether addressed to a jury, Head v. Hargrave, 105 U.S. 45, 49, 26 L. Ed. 1028; or to a judge, The Conqueror, 166 U.S. 110, 131, 133, 17 S.Ct. 510, 41 L. Ed. 937; or to a statutory board. Uncasville Mfg. Co. v. Commissioner, 2 Cir., 55 F.2d 893, 897; Tracy v. Commissioner, 6 Cir., 53 F.2d 575, 577; Anchor Co. v. Commissioner, 4 Cir., 42 F.2d 99, 100; Gloyd v. Commissioner, 8 Cir., 63 F.2d 649, 650. * * * To these perturbing tendencies, all operating to weaken the persuasive force of their opinions, there must be added still another, that of interest or bias, conscious or unconscious."

The burden was upon the taxpayer to prove that the valuation by the Comissioner was erroneous. This opinion evidence standing alone, and relating to only one method of valuing the stock, namely, by a valuation of the underlying assets, is scant evidence to sustain the taxpayer's burden. But the District Court had not only the weakness of the taxpayer's evidence to consider. He had other and pertinent evidence in the record as to the value of the preferred stock.

When the taxpayer purchased the assets from the old company, the latter had been operating a rag paper mill. Rag paper mills were being replaced rapidly by mills using the sulphite process, and at the time of the sale only about twenty-five or thirty-five per cent of the paper was produced by the rag mill process. Therefore, a valuation of the reproduction cost less depreciation must be considered as based upon a partially obsolescent property. In addition, the old company had not prospered for the several years immediately preceding 1938, its labor relations were bad, and in 1938 it was operating only two or three days a week. The earnings of the old company in the five-year-period prior to the sale were so low that when capitalized at seven per cent, they showed the value of said assets to be only $700,000. On December 31, 1937, the net book value of the fixed assets was $1,243,287.67, according to an examination of the books of the old company made by the Reconstruction Finance Corporation.

Shortly after the sale of the assets was consummated, the old company authorized its president to sell the preferred stock received from the taxpayer on such terms as he deemed to be for the best interest of the old company. The president authorized a Milwaukee brokerage firm specializing in unlisted securities to sell the stock. It had no success. He then authorized his son to sell the stock at $50 a share, but the son, after several attempts to sell the stock, found no buyer. The old company later listed the stock with the Milwaukee firm for sale at $50 a share. The firm found no buyer. No dividend had been paid on the preferred stock. Shortly after the sale of the assets, the stock had been offered to the taxpayer's president at $60 a share, and he had made a counter offer of $50 a share. In October, 1940, he purchased the stock, for and on behalf of the taxpayer, for $50 a share.

We think the efforts to sell the stock at $50 a share to the investing public without success and its sale finally to the taxpayer at $50 a share are very persuasive evidence as to the value of the stock, especially when considered in conjunction with the condition of the old company in 1938, including its low earning power, the book value of the assets as of December 31, 1937, and the fact that the country at the time of the sale was in the midst of what was called a "recession," the existence of which we judicially know. When these facts and circumstances are balanced against the very tenuous opinion evidence relied on by the taxpayer, we cannot say that the finding of the District Court was clearly erroneous, as we think that there was substantial evidence to support the finding.

The judgment is affirmed.