Arlen S. GOULD, Plaintiff,

v.

Daniel WALKER, Individually and as Governor of the State of Illinois; Squire J. Lance, Acting Director of the Governor's Office of Human Resources for the State of Illinois, Defendants.

No. 73 C 217.

United States District Court,
N. D. Illinois, E. D.

March 9, 1973.

George C. Pontikes, William J. Stevens, Foss, Schuman & Drake, Chicago, Ill., for plaintiff.

Richard C. Robin, Asst. Atty. Gen., State of Illinois, for defendants.

MEMORANDUM OPINION

WILL, District Judge.

This is a civil rights action brought pursuant to 42 U.S.C. §§ 1983 and 1985 by Arlen Gould, the Assistant to the Director and Special Education Coordinator of the Governor's Office of Human Resources of the State of Illinois (hereinafter "GOHR") and the Executive Secretary of the Governor's Council on Developmental Disabilities of the State of Illinois, against the Governor of the State of Illinois, Daniel Walker, and

Squire J. Lance, the Acting Director of GOHR. The plaintiff seeks: 1) a declaration that the proposed termination of his employment with the State of Illinois is violative of his constitutional rights and that because of this constitutional violation he is entitled to remain in his position with the State; 2) a preliminary and permanent injunction restraining the defendants from terminating him in his position; and 3) a judgment of $100,000 for damages suffered by the plaintiff due to the proposed termination. The defendants have moved to dismiss the complaint for failure to state a claim upon which relief can be granted.

The material facts of the case are not in dispute. Both sides have submitted numerous affidavits which in their essential allegations do not contradict each other. The plaintiff in his own affidavit states that in January 1970 he was hired as Special Education Coordinator of GOHR by Paul Wisner, who was then the Deputy Director of GOHR. In this position, he helped parents of handicapped children find State programs which would be of assistance to them and their children and thereby developed an expertise in the administrative and legislative programs in special education. He carried on communication with not only parents but also parents' organizations, school personnel and various professional people. As a result of these contacts, he was able to secure federal funding for a model program to compare costs of special education programs with those of general education. He is presently the project director of this $400,000 program.

Gould further states in his affidavit that he has prepared various studies regarding a number of social service programs which the State either had in existence or had under consideration. As a result of one of these studies, the Governor's Council on Developmental Disabilities was created. Gould was appointed Executive Secretary of this office, which disburses approximately $800,000 annually for handicapped children and adults, by Paul Wisner, who was appointed its Chairman by then Governor Richard Ogilvie.

Subsequent to Gould's employment at GOHR, Paul Wisner was promoted to become its Director. In his affidavit, Wisner states that he had personal authority to discharge Gould and that Gould was given the title Assistant to the Director only for the purposes of allowing him the flexibility to deal with matters outside the area for which he was originally hired. Wisner further states that Gould would make policy recommendations with respect to those matters on which he was working but that he (Wisner) would make all decisions with respect to policy except for unusual situations where the policy decisions were made by the Governor himself.

The defendants have submitted the affidavits of several employees of GOHR and consultants to that agency which set out in some detail both Gould's organizational position and some of his official activities. Donald Androzzo, a consultant to GOHR for the specific purposes of analyzing the decision making and organizational structures of GOHR, exists in an affidavit Gould's specific functions at GOHR. They are: 1) Director of Public Relations; 2) Director of Press Relations; 3) Director of Special Education Project; 4) Director of Every Needy Child Program; 5) Editor of Publications; and 6) Director of Latin American Cultural Exchange Program. In addition, Androzzo notes extensive out of state travel by Gould to Washington, D. C., California, Puerto Rico, and Mexico. During these trips, Gould represented the State in discussions leading to cultural exchanges between Illinois and both Mexico and Puerto Rico; he represented the State seeking federal assistance to various Illinois programs; and he attended conferences as an official representative of the State.

The affidavits of Steven Bishop, Deputy Director of GOHR, Marian Tingler, personal secretary to Gould, C. James McCoy, Spanish American Affairs Specialist at GOHR, David Finkel, con-

sultant to GOHR on the Special Education Program, Mari Kathryn Wade, Special Consultant to GOHR for the Developmental Disabilities Program, and Gloria T. Wailes, Public Information Specialist at GOHR, substantially affirm the allegations of the Androzzo affidavit.

Gould submitted a second affidavit which disagreed with and purported to clarify some of the points made in the various affidavits submitted by the defendants. However, the disagreement can be characterized as being largely technical or semantic. There is no disagreement that Gould holds a very responsible position with considerable authority and influence and that he has on a number of occasions represented the State in an official capacity.

On January 17, 1973, Gould was contacted by Squire J. Lance, who had been appointed Acting Director of GOHR by the recently elected Governor, Daniel Walker. At this meeting, Lance asked Gould for his resignation. Two days later, Gould wrote to Lance explaining why he would not resign and requesting the reasons why the defendants sought his resignation. Thereafter, Gould received a letter from Lance dated January 23, 1973, which informed Gould that he would be terminated as of January 31, 1973, but which gave no reasons for this termination.

Affidavits by Ron Maydon and Alphonse Gonzales suggest that Gould was asked to resign and thereafter terminated because he had supported former Governor Ogilvie in the recent election. The defendants have not contradicted these affidavits. Indeed, they have offered no reasons for Gould's termination.

### I.

There are three theories upon which plaintiff bases his cause of action. In Count I of the complaint, Gould contends that his termination "was based upon his political affiliation with the Republican Administration . . . and was done for the purpose of providing a vacancy for a Democratic supporter of Governor Walker, in violation of plaintiff's right of free speech and freedom of association, as protected by the due process clause of the Fourteenth Amendment to the United States Constitution." In support of this count, plaintiff relies upon Illinois State Employees Union Council 34, American Federation of State, County and Municipal Employees v. Lewis, 473 F.2d 561, (7th Cir. 1972), cert. denied 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973). In that case, the Seventh Circuit held that non-policy making employees of the state government are entitled to federal relief if they can prove that they were discharged because of their political affiliation and their refusal to transfer their political allegiance and that consequently their rights to freedom of speech and assembly were violated. The individual plaintiffs in Lewis were employed in the office of the Democratic Secretary of State of Illinois, Paul Powel in non-civil service positions such as clerks, janitors and license examiners. All received letters of termination which gave no reason for the terminations immediately after Republican Governor Ogilvie appointed Republican John Lewis as Secretary of State. The suit was filed pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1343 charging that the announced terminations came about solely because of their party affiliation and because they refused to support the Republican Party in violation of their First Amendment rights to freedom of speech and association. The District Court granted summary judgment for the defendant, and the Seventh Circuit reversed and remanded the case to the trial court.

The critical issue in the instant case with respect to Count I is whether a state employee with substantial responsibility and authority such as Gould is covered by the Lewis holding. In the majority opinion by Judge Stevens, the plaintiffs were characterized as "non-policymaking employees" and the opinion was limited to such employees. In

discussing the point that political affiliation may be a relevant and proper qualification for certain governmental positions and may justify an otherwise impermissible termination, Judge Stevens stated:

> The second suggested justification [that political affiliation is a relevant qualification for certain governmental positions] will also have different validity for different employees. Plaintiffs properly do not challenge the public executive's right to use political philosophy or affiliation as one criterion in the selection of policy-making officials. Moreover, considerations of personal loyalty, or other factors besides determination of policy, may justify the employment of political associates in certain positions. It is difficult to believe, however, that any such justification would be valid for positions such as janitors, elevator operators or school teachers. Thus, again, justification is a matter of proof, or at least argument, directed at particular kinds of jobs. The possibility of such valid justification for some positions does not afford a basis for dismissing all of plaintiffs' claims without a trial. 473 F.2d at 574.

By concluding that the plaintiffs in *Lewis* were not in governmental positions which may justify termination for reasons of political affiliation, the Court avoided the precise issue presented by the instant case.

Judge Campbell, however, in his concurring opinion dealt directly with the problem of distinguishing between types of governmental employees for purposes of fitting into the *Lewis* holding. He said:

> The scope and complexity of the litigation problems created by our ruling are not lessened by our limiting its applicability to "non-policy making" government personnel. It is simple enough to say that janitors, clerk-typists and elevator operators are "non-policy making" employees, but how far up in the bureaucratic echelon can the distinction be judicially drawn? What about a janitorial supervisor, the director of a stenographic pool, a personnel manager, a deputy assistant division head, a deputy director, or even a secretary to a top-echelon director or department head who may have access to confidential information? As Judge Stevens so aptly states, there may be instances when political affiliation constitutes a proper qualification for public employment, particularly in the selection and appointment of "policy-making" officials. Indeed, no one has challenged the right of an elected official to appoint to such positions and for whatever reasons he deems proper, persons in whose loyalty and competence he has the highest confidence. The difficulty arises in attempting to fashion an appropriate and workable judicial standard for distinguishing between "policy-making" and "non policy-making" positions. In my judgment, the constitution would permit a public official to hire or dismiss on the basis of political association any employee engaged directly or indirectly in the formulation or implementation of the policies of the particular governmental office or agency. A more precise standard is difficult to articulate and thus the true impact of today's decision must necessarily await case by case determination.

Judge Kiley in his dissent did not address himself to the possible problems which might arise from trying to distinguish between types of governmental employees regarding their rights upon dismissal.

■ In attempting to fit Gould into the *Lewis* framework it can be initially and assuredly stated that he is a different type of governmental employee than the license examiners, janitors and clerks who comprised the plaintiff class in *Lewis*. Clearly, because of his undisputed responsibility and authority he is not covered by the strict holding of the *Lewis* case. In the terminology of Judge Stevens, the issue then is whether

Gould is the type of governmental employee whose termination may be justified on the ground of political affiliation. We conclude that he is.

We are hard pressed to articulate a more helpful standard than that propounded by Judge Campbell which allows termination on the basis of political affiliation if the terminated employee is "engaged directly or indirectly in the formulation or implementation of the policies of the particular governmental office or agency." On the basis of the essentially undisputed affidavits in the instant case, Gould is clearly engaged directly in the implementation of the policies of GOHR and engaged indirectly in the formulation of those policies. Therefore, the defendant public officials were constitutionally entitled to dismiss or terminate Gould on the basis of his political affiliation. Consequently, Count I of the complaint may be stricken as failing to state a claim upon which relief can be granted.

## II

In Count II of the complaint it is alleged that "[t]he termination of plaintiff's employment by the defendants was in direct retaliation for his exercise of his right of free speech by calling defendant WALKER a liar [during the gubernatorial campaign] . . . . The termination of plaintiff's employment was, thereby, a violation of his right to exercise his free speech, as protected by the due process clause of the Fourteenth Amendment to the United States Constitution."

There is no question that, as a general matter, it has been held that the government may not terminate an individual's employment because of his exercise of a constitutionallly protected right such as free speech. See Connell v. Higginbotham, 403 U.S. 207, 91 S.Ct. 1772, 29 L. Ed.2d 418 (1971); Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.

Ct. 675, 17 L.Ed.2d 629 (1967); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958); Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952); Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L. Ed. 1628 (1943); and Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). However, there is a problem with this line of cases similar to that caused by the opinion in the above discussed *Lewis* case. There are situations in which the public statements of a governmental employee and other voluntary exercises of the freedom of expression about which a superior is distressed or otherwise displeased may justify the termination of the individual in his governmental position if it is one for which personal loyalty or personal interplay is important.

Justice Marshall, in Pickering v. Board of Education, *supra,* the most recent fully articulated opinion by the Supreme Court in this area, recognized this problem when he limited the scope of the opinion by stating: "Because of the enormous variety of fact situations in which critical statements by teachers and other public employees may be thought by their superiors against whom the statements are directed, to furnish grounds for dismissal, we do not deem it either appropriate or feasible to attempt to lay down a general standard against which all such statements may be judged." 391 U.S. at 569, 88 S.Ct. at 1735. He went on to point out that the employment relationship between the terminated employee and the criticized superior in *Pickering* was not "the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." 391 U.S. at 570, 88 S.Ct. at 1735.

In the instant case, however, we find that the working relationship between Gould and his superiors, including the governor, is one in which personal

loyalty and confidence are necessary to the proper functioning of GOHR. As discussed above, Gould is not an employee such as a janitor or a clerk or even a teacher. Rather, he is employed at the highest levels of an important and large governmental agency which has responsibility for the dispersal of millions of dollars of governmental funds. He is indirectly engaged in the formulation of policy for GOHR and directly engaged in the implementation of that policy at a very high level. In such a position, good relations between himself and the Governor and the Director of GOHR are absolutely critical.

Consequently, the defendants may terminate his employment with the state on the basis of the uncomplimentary remarks about the Governor which he made during the recent campaign. Count II then may be stricken for failing to state a claim upon which relief can be granted.

### III

In Count III of the complaint it is alleged that "[t]he termination of plaintiff's employment as aforesaid was in violation of plaintiff's procedural rights to due process, . . . [as provided by] the Fourteenth Amendment to the Constitution of the United States in the following respects: A) Plaintiff was given no reason for the termination of his employment, even though he requested such reasons in writing from the defendant. . . . B) Plaintiff was given no hearing regarding the termination of his employment. C) The plaintiff was given no other opportunity to present evidence on his behalf."

In the recent companion cases of Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the Supreme Court set forth and explained the various constitutional rights to procedural due process which attend the dismissal of a public employee. In

*Roth,* the Court held that a non-tenured teacher is not entitled to a statement of the reasons and an opportunity for a hearing prior to the termination of his contract unless he can show that the decision to terminate his employment somehow deprived him of an interest "encompassed within the Fourteenth Amendment's protection of liberty and property." 408 U.S. at 569, 92 S.Ct. at 2705. The Court found that the plaintiff-teacher in *Roth* had no property interest at stake because his contract had a fixed and definite termination point after a one year period and because he had not demonstrated a pattern of reemployment for persons in his position and/or any other expectation of reemployment.

In *Sindermann,* however, the Court did find that the plaintiff-teacher had shown a legitimate property interest in his continued employment as a teacher because of a clear pattern of contract renewal and because of guidelines promulgated by the state college system in which he was employed which made reference to contract renewals.

In the instant case, Gould has made no allegations and the affidavits demonstrate no possible property interest in his employment with GOHR such that procedural due process would attach as contemplated under the *Roth* and *Sindermann* opinions. The affidavit of Paul Wisner, former Director of GOHR, stated that he had hired Gould personally and that he (Wisner) had the authority to discharge or otherwise terminate Gould's employment with GOHR. In addition, plaintiff has not alleged or demonstrated by way of affidavit any pattern of reemployment or other expectation of the continuation of employment in his position or in a similar position with the state. Further, the political realities of job assignments within the upper level of state government would seem to indicate that it would be virtually impossible for the plaintiff to show any justified expectation of continued

employment in the Executive branch of state government when he is a member of a political party different from that of the newly elected Chief Executive. Indeed, the allegations of the first count and its reliance upon the *Lewis* opinion would indicate the lack of any pattern of continued employment of personnel who belonged to or supported the recently defeated and outgoing political party. Therefore, Gould had no property interest in his position with the state when he was terminated.

Moreover, the analysis with respect to Counts I and II above clearly shows that the plaintiff had no liberty interest at stake when he was terminated from his position. Since the defendants could terminate because of his political affiliation and/or because of certain statements which he had made, he had no interest which warranted the procedural protection afforded by due process.

Consequently, since the defendants were not required to afford Gould notice of the reasons for his termination or any opportunity for a hearing to respond or challenge that termination, Count III of the complaint may be stricken as failing to state a claim upon which relief can be granted.

Since each of the three counts of the instant complaint fails to state a claim upon which relief can be granted, the case must be dismissed. The defendants have moved for dismissal pursuant to Rule 12, Fed.R.Civ.P. However, because each side has submitted extensive affidavits which were the basis of the arguments in their briefs, which disclose no dispute as to any material fact and which were relied upon by the court for decision in this opinion, it is appropriate for the court to enter summary judgment for the defendants.

Accordingly, an appropriate order will enter granting summary judgment for the defendants.